**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| MATTHEW W. MIDDLETON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:06-CV-52-TS |
| | ) | |
| SHERIFF KENT FARTHING, in his | ) | |
| representative capacity, | ) | |
| DEPUTY SCOTT A. LEWIS, | ) | |
| HUNTINGTON COUNTY SHERIFF'S | ) | |
| DEPARTMENT, OFFICER DON | ) | |
| DOUGLAS, OFFICER PHIL ROGERS, | ) | |
| and OFFICER BECKY BENNETT, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

The Plaintiff claims that the Defendants committed the tort of battery and violated his

constitutionally protected right to be free from excessive force. This matter is before the Court

on the Defendants' Motion for Summary Judgment [DE 30] on the constitutional claim.


**BACKGROUND**

On April 8, 2005, the Plaintiff, Matthew A. Middleton, served a Notice of Tort Claim on

the Huntington County Sheriff's Department and Huntington County Jail for events that took

place at the jail on October 30, 2004. On February 22, 2006, the Plaintiff filed a Complaint

against Huntington County Sheriff,[1] Deputy Scott A. Lewis, the Huntington County Sheriff's

Department, and unknown jail officers. Using 42 U.S.C. § 1983, the Plaintiff alleges that Deputy

---

[1] The Plaintiff's Complaint named Leroy W. Stricker as the sheriff of Huntington County. On March 1, the
Plaintiff moved to amend the complaint to correctly identify the sheriff as Kent Farthing. The motion was granted on
March 8.

Lewis and the Huntington County Jail officers violated his rights under the Fourth and Fourteenth Amendments when they used excessive force against him on October 30, 2004. The Plaintiff sues the Sheriff in his representative capacity as the employer of the officers whose tortious acts caused him harm and under the doctrine of respondeat superior.

The named Defendants filed an Answer on April 19, 2006. On June 26, 2006, the Plaintiff filed a Second Amended Complaint that identifies Don Douglas, Phil Rogers, and Becky Bennett as the individual jail officers who were involved in the October 30, 2004, incident. The Second Amended Complaint also clarifies that the individual Defendants' conduct constitutes battery against the Plaintiff as well as excessive force in violation of the constitution. On July 6, 2006, the Defendants answered the Second Amended Complaint.

On December 19, 2006, the Defendants moved for summary judgment on the Plaintiff's federal claims. The Defendants submit that there are no genuine issues of material fact, that the Defendants did not violate the Plaintiff's Fourteenth Amendment rights, and that, in any event, they are entitled to qualified immunity. On January 18, 2007, the Plaintiff responded. He argues that the Fourth Amendment, not the Fourteenth, applies to his claims of excessive force and that material issues of fact require submission of his claims to a jury. On January 24, the Defendants replied that the Plaintiff failed to designate genuine issues of material fact in the manner required by Federal Rule of Civil Procedure 56, that the Fourteenth Amendment is the applicable constitutional amendment, that their conduct does not "shock the conscience," as required for a Fourteenth Amendment violation and that, in any event, they are entitled to qualified immunity.

After obtaining court approval, the Plaintiff filed a sur-reply on February 1. He argues that he has properly identified genuine issues of material fact and that reasonable inferences from

these facts demonstrate that the Defendants violated his rights, regardless of whether his case is analyzed under the Fourth or Fourteenth Amendment. He also submits that the officers should have known that their conduct violated his constitutional rights and they are not entitled to qualified immunity. On February 7, the Defendants filed their Sur-Response. They reiterate their argument that the Plaintiff's Statement of Genuine Issues fails to identify facts in dispute and does not comply with the requirements of Rule 56 or Local Rule 56.1. They also assert that the Plaintiff's failure to identify any case that clearly establishes his purported rights subjects his suit to summary dismissal under the doctrine of qualified immunity.

## STANDARD OF REVIEW

### A.      Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th

Cir. 1994) (citations and quotation marks omitted). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

**B.      Plaintiff's Response to Defendants' Motion for Summary Judgment**

The Defendants request that the Court disregard the Plaintiff's "Statement of Genuine Issues of Material Fact." They argue that he has failed to designate genuine issues of material fact and, instead, has submitted a summary of various pleadings and discovery responses, which includes immaterial and undisputed facts. They assert that "[n]o attempt is made to synthesize these pleadings into a coherent statement of genuine issues." (Resp., DE 35 at 2.)

The Court finds that, while the Plaintiff's Statement of Genuine Issues is not conventional in its format and does not limit itself to only those facts that are in dispute, it is nonetheless sufficient to apprise this Court of the facts that the Plaintiff believes support his

4

claim, that are potentially determinative, and that are necessary to be litigated. The facts of this case are not so complicated that the Court cannot discern them. Moreover, the facts are accompanied by "appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence." N.D. Ind. L.R. 56.1(a). Therefore, the Court will not strike the Plaintiff's Statement of Genuine Issues. However, any of the Defendants' facts that are "claimed and supported by admissible evidence" and not properly controverted by the Plaintiff's Statement of Genuine Issues will be "admitted to exist without controversy." N.D. Ind. L.R. 56.1(b). The Court also notes that it will not consider that portion of the Plaintiff's Statement of Genuine Issues that relies solely on the allegations asserted in his Second Amended Complaint. *See Celotex*, 477 U.S. at 324 (holding that a plaintiff cannot oppose summary judgment by resting on his pleadings).

## STATEMENT OF FACTS

On Saturday evening, October 30, 2004, Deputy Lewis stopped a car whose driver he suspected was intoxicated. The driver, Plaintiff Matthew Middleton, was administered road-side sobriety tests, including a field blood-alcohol test that registered his blood alcohol level at .12. Deputy Lewis handcuffed the Plaintiff and transported him to the Huntington County Jail for further testing. At the jail, the Plaintiff complied with further testing, including a data master test for intoxication, which registered his blood alcohol content at .10. The results of the data master test provided cause to arrest him for operating while intoxicated.[2] The Plaintiff then told Deputy

---

[2] Because of his previous criminal record for driving while intoxicated, the charges the Plaintiff faced were felony charges.

5

Lewis that he was done talking to him and would talk to his lawyer.[3]

Upon his arrest, the Plaintiff was directed to put all his personal belongings in a bag that he could recover when he was discharged. The Plaintiff's hair was in a pony tail, but he did not put the hair tie in the bag of belongings. He was under the impression that he was not required to remove the hair tie (given his experience at other jails) and was not told otherwise. Deputy Lewis then escorted the Plaintiff to a holding cell known as the "drunk tank." As the Plaintiff was approaching the cell, Deputy Lewis noticed the hair tie and asked him to remove it. The Plaintiff took it out, dropped it on the floor near the cell door, and continued into the cell where he sat down on the wooden bench as he was previously directed. Nobody else was in the holding cell or any areas adjacent to the cell because all other inmates were in the back part of the jail. Deputy Lewis told the Plaintiff, "Get over here and pick this up right now." The Plaintiff responded, "Fuck you" and said he was not his dog and was not going to pick it up. He also made comments to the effect that Deputy Lewis should go "bust a meth lab" or arrest a criminal.[4] Deputy Lewis repeated his command to pick up the hair tie, and the Plaintiff again responded with the same expletive.

Deputy Lewis then entered the cell and tried to physically pick the Plaintiff up from the bench, but was unsuccessful because the Plaintiff was holding on to the bench with both hands. Deputy Lewis said, "You're going to pick that up right now, or I'm going to make you." (Pf.'s Dep. 44.) The Plaintiff told him he was a bitch and could not move him. (Pf.'s Dep. 44.) Deputy Lewis pinched the Plaintiff's back and arm, leaving pink gouge marks. After the Plaintiff

---

[3] In his police report, Deputy Lewis described this statement as "abusive."

[4] Deputy Lewis asserts that the Plaintiff made these comments before being escorted to the drunk tank.

laughed at Deputy Lewis for pinching him, Deputy Lewis left the cell. The Plaintiff believes that, when Deputy Lewis left, he did not close the cell door. (Pf.'s Dep. 46–48.) He also thought that the incident was over.

Deputy Lewis returned to the drunk tank with three jail officers, Don Douglas, Phil Rogers, and Becky Bennett, and again asked the Plaintiff to pick the hair tie off the floor. The Plaintiff refused the command. In his deposition, the Plaintiff testified about what happened next:

> They jumped me, they pulled me off the bench and then handcuffed me to the same bench that I was on. They pulled me off of it, put my head against the wall and smashed my head against the wall, and, you know, pulled my arms back to a chicken wing and, you know, beat me up pretty much, and then handcuffed me to the same bench I was refusing to get off of.

(Pf.'s Dep. 49.)[5] Later in the same deposition, the Plaintiff states that they were physically trying to get him down and make him say he would pick up the hair tie and "they had my head against the wall, and one of them was behinwd me with my feet, and they were pushing. I don't know how much pressure it takes to bruise someone's chest with a table or something, but they were shoving me down on it so hard that it bruised across my chest." (Pf.'s Dep. 101–02.) He stated that they picked him up and slammed him on the floor and on the bench. (*Id.*) The Plaintiff physically resisted the officers' use of force by maintaining his hold on the bench but did not try to hit, kick, or otherwise hurt them. (Pf.'s Aff., ¶ 11.) The Plaintiff guesses that the officers were in the cell for five to six minutes. (Pf.'s Dep. 106.) He was then handcuffed to the bench for about three hours. (Pf.'s Dep. 106.) The Plaintiff did not pick up the hair tie and there is no

---

[5] The Plaintiff believes that Officer Bennett stood at the cell door and did not actually touch him. The Defendants' discovery response indicates that she entered the cell and assisted the other officers by restraining his left arm so Officer Douglas could place him in handcuffs.

record as to what happened to it.

When the Plaintiff was released from the Huntington County Jail two days later, his mother took pictures of his injuries. These included a chip in one of his artificial front teeth from hitting it on the drunk tank bench, marks from being pinched, a bruise across his chest from the bench, scrapes and marks on his knees from the cell floor, and a bruise on his side from being punched or kicked.[6]

The following Thursday, the Plaintiff visited his family doctor for pinch marks, bruising, a swollen and bruised knee, chipped tooth, and knot to his tail bone. The doctor did not order any treatment.

On June 21, 2005, the Plaintiff entered a plea of guilty to charges that stemmed from the October 30, 2004, arrest and jail incident in exchange for the dismissal of other charges. He pleaded guilty to two charges related to operating a vehicle while intoxicated and a misdemeanor disorderly conduct charge. In his motion to enter a plea of guilty, the Plaintiff  admitted facts related to the disorderly conduct charge:

> I was asked to remove my hair tie. I removed my hair tie and threw it on the floor. The officer asked me to pick it up and I told him "fuck you" I wasn't going to do it. He asked me again to pick it up and I continued to use expletives even after the officer told me to stop.

DE 34-15, ¶ 15.) He also agreed that he "made unreasonable noise and continued to do so after being asked to stop." (Pf.'s Dep. 64.)[7]

---

[6] The Defendants note that the Plaintiff admitted he could not see what was happening behind him to cause the bruise.

[7] In Indiana, it is disorderly conduct, a Class B misdemeanor, when a person "recklessly, knowingly, or intentionally: (1) engages in fighting or in tumultuous conduct; (2) makes unreasonable noise and continues to do so after being asked to stop; or (3) disrupts a lawful assembly of persons." Ind. Code § 35-45-1-3(a).

**DISCUSSION**

**A.     Source of the Plaintiff's Constitutional Right**

To state a claim under § 1983, a plaintiff must establish that a defendant, acting under

color of state law, deprived him of his constitutionally protected rights. *See* 42 U.S.C. § 1983.

Before this Court can analyze the Plaintiff's § 1983 claim, it must identify the "specific

constitutional right allegedly infringed by the challenged application of force." *Graham v.

Connor*, 490 U.S. 386, 393 (1989). This right then determines the appropriate analytical lens

through which the facts are viewed. *Wilson v. Williams*, 83 F.3d 870, 874 (7th Cir. 1996). For

example, in cases involving arrest, investigatory stop, or other "seizure" of a free citizen, the

"objective reasonableness" standard of the Fourth Amendment applies. *Id.* (citing *Graham v.

Connor*, 490 U.S. at 395). In cases involving convicted prisoners, the Eighth Amendment's

"cruel and unusual punishment" or "unnecessary and wanton infliction of pain" standard is used.

*Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 318–22 (1986)).

> Between the status of free citizen and convicted prisoner lies the "pretrial
> detainee," protected by the due process clause of the Fourteenth Amendment.
> Jurisprudence surrounding this clause makes clear that such individuals, who
> though detained have not been found guilty of any crime, may not be "punished"
> by the state in any way. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

*Wilson*, 83 F.3d at 875 (7th Cir. 1996) (parallel citation omitted).

The Defendants contend that the Plaintiff was a pretrial detainee and that his claim is

governed by the Fourteenth Amendment. The Plaintiff lobbies for application of the Fourth

Amendment's reasonableness standard, contending that he was still an arrestee who was being

seized by Deputy Lewis and other state actors. Which standard applies turns on whether the line

between seizure and detention was crossed before the Defendants applied the challenged force.

9

This issue was addressed in *Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006), when the Seventh Circuit verified that, even if a person is being detained, the Fourteenth Amendment does not apply until after a judicial determination of probable cause. The court held that, because Lopez was arrested without a warrant and had not yet been presented for a probable cause hearing, his claims relating to the treatment and conditions he endured during detention were governed by the Fourth Amendment. *Lopez*, 464 F.3d at 719. ("Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction.") (referring to *Gerstein v. Pugh*, 420 U.S. 103 (1975)).

The Plaintiff asserts that *Lopez* means that his claims are governed by the Fourth Amendment. The Defendants acknowledge the holding in *Lopez*, but argue that it is not controlling here because it only applies to claims regarding the duration or the conditions of confinement, not to excessive force claims like the one asserted by the Plaintiff. The Court does not agree with the Defendants that *Lopez* makes this distinction. Under *Lopez* and predecessor cases, whether the Fourth Amendment or the Fourteenth Amendment applies in a jail setting depends on the plaintiff's status as an arrestee, pretrial detainee, or convicted prisoner. There is no discussion in these cases suggesting that the status also depends on the sort of acts alleged to violate the plaintiff's constitutional rights. Rather, the Seventh Circuit has made it clear that when a citizen is arrested without a warrant, his status does not change to that of a pretrial detainee until after a judicial determination of probable cause. *Lopez*, 464 F.3d at 719 (stating that the "probable cause hearing is the event that terminates the Fourth Amendment's application

following a warrantless arrest"); *see also Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) ("There is, to be sure, a difference between the constitutional provisions that apply to the period of confinement before and after a probable cause hearing: the Fourth Amendment governs the former and the Due Process Clause the latter.");[8] *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) ("[T]he Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause."). *Lopez* tells us that the Plaintiff's "seizure" had not yet come to an end. The Supreme Court tells use that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment." *Graham*, 490 U.S. at 395.

The Plaintiff was arrested without a warrant and escorted to a cell where he claims he was subject to excessive force when he would not comply with an officer's command. There is no evidence that any event terminated the application of the Fourth Amendment and rendered the Plaintiff a pretrial detainee prior to these events. The Defendants' actions were part of the continuing seizure that began when Deputy Lewis handcuffed the Plaintiff and brought him to the jail. As such, they are governed by the Fourth Amendment.

---

[8] The Defendant argues that the court's reference to "the period of confinement" in *Luck*, refers to period of confinement type claims rather than to describe the time spent in jail, either between arrest and a probable cause hearing or after a probable cause hearing. This flawed reasoning does not avoid the implication of *Lopez*.

**B.      Qualified Immunity**

Even if the Defendants violated the Plaintiff's Fourth Amendment rights, they will be

immune from suit if reasonable officers could have believed that their conduct was constitutional

in light of clearly established law and the information they possessed at the time. *Anderson v.*

*Creighton*, 483 U.S. 635, 639 (1987); *Frazell v. E.K. Flanigan*, 102 F.3d 877, 886 (7th Cir.

1996).

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes
> can be made as to the legal constraints on particular police conduct. It is
> sometimes difficult for an officer to determine how the relevant legal doctrine,
> here excessive force, will apply to the factual situation the officer confronts. An
> officer might correctly perceive all of the relevant facts but have a mistaken
> understanding as to whether a particular amount of force is legal in those
> circumstances. If the officer's mistake as to what the law requires is reasonable,
> however, the officer is entitled to the immunity defense.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001). "The police cannot have the specter of a § 1983 suit

hanging over their heads . . . as long as their behavior falls within objectively reasonable limits."

*Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996).

The analysis of a qualified immunity defense requires a two-step inquiry. First, a court

must answer the threshold question whether the alleged facts, taken in the light most favorable to

the party asserting the injury, show that the officer's conduct violated a constitutional right.

*Saucier*, 533 U.S. at 201. Second, assuming that a plaintiff is able to establish a constitutional

violation under a favorable view of the facts, "the next, sequential step is to ask whether the right

was clearly established." *Id.* In other words, a court must consider whether the law clearly

established that the officer's conduct was unlawful in the circumstances of the case. *Id.*

The Defendants argue that they are entitled to immunity because they did not violate the

Plaintiff's constitutional rights when they used no "more force than was necessary to achieve

institutional control, a substantial and important governmental interest." (DE 31 at 19.) They

submit that even if this Court determines that they violated the Plaintiff's rights, his right to be

free from the force used to make him comply with an officer's order was not clearly established.

The Plaintiff contends that his Fourth Amendment rights were violated and that it was clearly

established that officers do not have the right to pinch, hit or kick, and slam a person's body to

the floor and bench to make him comply with an order when that person is not physically

resisting arrest or otherwise presenting a threat of harm.

### 1.        Violation of Fourth Amendment Rights

> The Fourth Amendment protects against unreasonable seizures, not seizures that
> "shock the conscience" or cause "severe injuries." If, under the totality of
> circumstances, a police officer unreasonably seizes a person by using excessive
> force, he has violated that person's Fourth Amendment rights. The objectively
> unreasonable seizure itself (regardless of the officer's motive or whether any
> injury inflicted was severe) crosses the constitutional threshold.

*Lester v. City of Chi.*, 830 F.2d 706, 712 (7th Cir. 1987); *see also Graham*, 490 U.S. at 397

("The reasonableness inquiry is an objective one. The question is whether the officers' action are

objectively reasonable in light of the facts and circumstances confronting them, without regard to

their underlying intent or motivation."). The Fourth Amendment reasonableness inquiry involves

"a careful balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests at stake." *Graham*, 490

U.S. at 396 (citations and quotation marks omitted).

In any Fourth Amendment case, the reasonableness test is "not capable of precise

definition or mechanical application." Nevertheless, the courts have developed a list of facts and

circumstances to consider when analyzing reasonableness. The Court will look to the facts and

circumstances considered in two different lines of excessive force cases.

The first line of cases are those evaluating an arresting officer's use of force during the initial arrest. In such cases, relevant considerations include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The reasonableness of the arresting officer's actions must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

As the case law suggests, a certain amount of force may be justified in the heat-of-the-moment arrest. In this case, the evidence most favorable to the Plaintiff does not support a conclusion that the circumstances were the tense, uncertain, and rapidly evolving ones that can accompany the arrest of a person who is presenting a threat to safety. Rather, when Deputy Lewis twice commanded the Plaintiff, who was already seated on a cell bench, to pick up his hair tie, the Plaintiff did not move. When Deputy Lewis could not obtain compliance, he left the Plaintiff unattended in the open cell while he went to get jail officers to help him.

Although the situation facing the Defendants was not so precarious, the Court acknowledges that a different governmental interest was potentially at stake in the jail where the altercation took place. This brings the Court to the second line of cases.

In prisoner excessive force cases the "core judicial inquiry" is "whether force was

14

applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). The Seventh Circuit has identified objective factors to distinguish between the two scenarios. These factors are helpful even though the Defendants' motives and subjective intent are not at issue in this case. *See Wilson v. Williams*, 83 F.3d 870, 876 (7th Cir. 1996) (noting that these factors are also generally relied on in the Fourth Amendment excessive force context). A court may consider: (1) the extent of the injury suffered; (2) the need for the application of force; (2) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *See Hudson*, 503 U.S. at 7; *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000).

At the time the Plaintiff was subjected to force, he had already been transported to the jail, undergone several tests, been placed under arrest, and escorted to the drunk tank by Deputy Lewis without incident.  He did not act aggressively toward or physically threaten Deputy Lewis or anyone else at the jail. He did not resist being placed in the cell or try to escape from it. In fact, the evidence most favorable to the Plaintiff is that Deputy Lewis did not even close the cell door when he left to get more officers, suggesting that Deputy Lewis did not perceive the Plaintiff as a threat or an escape risk. The Plaintiff used obscenities to respond to Deputy Lewis's command, but, according to the Plaintiff's version of events, they were not accompanied by any threat of force or harm.[9]

The Defendants place heavy emphasis on the fact that the Plaintiff was not complying

---

[9]  Other than discussing whether Officer Bennett was involved in the altercation or standing at the cell door, the parties' briefs discuss the Defendants as a collective group. As a result, this Court is not aware of the specific facts or perceptions that Officer Douglas or Officer Rogers had when they later accompanied Deputy Lewis to the cell and engaged in the alleged conduct.

with Deputy Lewis's command to pick up the hair tie. But the Defendants have put no evidence in the summary judgment record to suggest that this command was related to the jail's internal security. The Defendants admit that "the hair tie itself" was not dangerous. (DE 35 at 8.) Instead, they argue that the Plaintiff's mere failure to comply undermined the institutional control of the Huntington County Jail because "they emboldened the Plaintiff, and perhaps every other inmate within earshot, to defy the orders of the officers." (DE 31 at 16.) They assert that the Plaintiff's defiance "posed a threat to order and discipline at the Huntington County Jail, and thus posed a potential threat to both the Plaintiff, the officers, and other inmates." (DE 35 at 8.) While this is in fact a legitimate governmental interest in a jail or prison setting, the facts most favorable to the Plaintiff establish that no other inmate was within sight or earshot of the Plaintiff or the Defendants. One of the Defendants' interrogatory answers provides: "At the time of the subject incident, there were no inmates in the holding cell or any areas adjacent to the holding cell other than the Plaintiff. All other inmates were in the back of the jail facility in their respective cells." (DE 34-8 at 3.) This does not represent the type of situation where institutional security and the safety of guards or inmates is at risk. *Cf. Blair-El v. Tinsman*, 666 F. Supp. 1218, 1221 (S.D. Ill. 1987) (holding that use of gas was reasonable to restore prison security when the "disturbance threatened to spill out into the general population. The situation had, at that point, reached a volatile and dangerous level."). It is not clear that Deputy Lewis himself appreciated institutional security risks when he asked a legally intoxicated person who had just been arrested on felony charges to pick something up near or outside the cell door after he was already safely inside the cell. (It is not clear from the record whether the hair tie was inside the cell or outside the cell—only that it was near the door.)

Weighed against these factors is the measure of force the Plaintiff alleges was used: pinching his back and arms, forcibly picking him up and slamming his body on the bench and his knees on the floor, pushing his body down on the bench with enough force to bruise his chest, pushing and smashing his head against the wall, hitting his mouth against the bench hard enough to chip a tooth, pulling his arms back, and delivering a punch or kick that left a bruise on his side before handcuffing him to the bench.

Given these circumstances, a jury could determine that Deputy Lewis's order was not given for any legitimate purpose, that immediate compliance with the command was not necessary for institutional security, and that reasonable alternatives to the application of force were available, such as leaving the plaintiff alone in the cell and charging him with a misdemeanor for disorderly conduct—the action eventually taken. Without evaluating the weight of the evidence, judging the credibility of witnesses, or determining the truth of the matter, the facts and reasonable inferences most favorable to the Plaintiff are enough to show that it was not reasonable for the Defendant to use the level of force alleged to manage his noncompliance.

The four cases that the Defendants contend clearly establish that the force they applied in response to the Plaintiff's resistance was reasonable do not convince this Court that this issue is outside the province of a jury. The Defendants cite *Metcalf v. Long*, 615 F. Supp. 1108 (D.C. Del. 1985), *McCullar v. Babb*, 2006 WL 623604 (N.D. Ind. March 10, 2006), *Damm v. Sparkman*, 609 F. Supp. 749 (D.C. Kan. 1985), and *Perkins v. Brown*, 285 F. Supp. 2d 279 (E.D.N.Y. 2003).[10] All four cases are distinguishable.

---

[10] The Defendants actually offer these cases in their discussion of whether the Plaintiff's right to be from excessive force under the circumstances presented in this case was clearly established: "Defendants would submit that the great weight of case law from across the country does in fact demonstrate a clearly established right; the right of the Defendants to use the amount of force used in the face of Plaintiff's resistance." (DE 31 at 20.)

In *Metcalf*, a case decided by a district court in Delaware nineteen years before the events at issue in this case, the court stated that the Fourth Amendment was not applicable to the plaintiff's excessive force claim and held that the defendant officers' conduct did not "shock the conscience." 615 F. Supp. at 1120–21 (relying on fact that brief skirmish only resulted in minor injuries). Because it applied a different constitutional standard, *Metcalf* has no application to this case.

*McCullar* is not helpful either. In *McCullar*, the implicated constitutional right, the level of force applied, and the governmental interest at stake are all distinguishable. Because the plaintiff was a pretrial detainee, the court asked whether the defendants acted maliciously when they required McCullar to disrobe in front of other inmates and a female officer. 2006 WL 623604, at *6. As part of the plaintiff's proof that the defendants acted with the requisite malice during the jail's clothing exchange process, he pointed to a jail officer's use of force. The force applied included handcuffing, shoving, and pulling the plaintiff from his cell after he refused four times to remove his jumpsuit so he could be issued clean clothes. *Id.* at *7–8. The court found that the plaintiff's failure to disrobe when asked interfered with the intent of the written clothing exchange policy, which was to provide an orderly and controlled exchange procedure. *Id.* at *7.

In *Damm v. Sparkman*, again, the constitutional amendment at issue was the Fourteenth Amendment, not the Fourth Amendment. 609 F. Supp. at 754. The court held that the defendant's conduct "was not sufficiently egregious to amount to a substantive denial of Mr. Damm's due process rights," was not "an abuse of power that shocks the conscience" and that there was no evidence from which to infer that the defendant "was motivated by sheer malice."

18

*Id.* Moreover, the plaintiff's own conduct set the stage for the officer's response by his "resistance to being arrested and being handcuffed in the first instance," by his "refus[al] to cooperate with the booking procedure," by his refus[al] to leave the booking area and go to the cell as requested by officers," and "again resist[ing] being handcuffed." *Id.*  The Plaintiff, by contrast, did not resist being handcuffed, brought to the jail, taking tests, or being arrested. He presented no opposition to Deputy Lewis as he escorted him to the drunk tank. The entire altercation arose because the Plaintiff dropped his hair tie on the floor and refused to pick it up after he was already arrested, booked, and secured in a cell.

The Defendants' claim that *Perkins v. Brown* is factually similar also falls short. In *Perkins*, the plaintiff, a known gang member with a history of violent behavior, refused to submit to a strip search before being allowed to attend a courtroom proceeding. 285 F. Supp. 2d at 281. One of the defendants had previously witnessed the plaintiff slash another inmate and the plaintiff admitted that he always carried a razor with him when he went to court. *Id.* at 285. Because he was a pretrial detainee at the time of the events the court applied the Fourteenth Amendment's objective and subjective test. *Id.* at 283. The court found that the plaintiff failed to meet the objective prong of the test because his injuries were de minimus and the force used was "not repugnant to the conscience of mankind." *Id.* at 284.

The facts submitted at this stage of litigation are sufficient to allow a reasonable jury to determine that the Defendants' action were not objectively reasonable in light of the facts and circumstances confronting them. However, this Court must still determine whether the Plaintiff's right to be free from the excessive force exerted by the Defendants was "clearly established" at the time of the incident. If it was not, the Defendants are nevertheless entitled to qualified

immunity.


2.      **Clearly Established**

An officer is entitled to qualified immunity despite having engaged in conduct that

violates the constitution if, in doing so, he did not violate "clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.

To be clearly established, the right in question must be

> sufficiently clear that a reasonable official would understand that what he is doing
> violates that right. This is not to say that an official action is protected by
> qualified immunity unless the very action in question has previously been held
> unlawful; but it is to say that in the light of pre-existing law the unlawfulness
> must be apparent.

*Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S.

635, 640 (1987)). This inquiry "must be undertaken in light of the specific context of the case,

not as a broad general proposition." *Saucier*, 533 U.S. at 201. "For a right to be clearly

established, however, we need not have a prior case that is founded on materially similar facts;

officials may still be on notice in 'novel factual circumstances.'" *Miller v. Jones*, 444 F.3d 929,

934 (7th Cir.  2006) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *McDonald v. Haskins*,

966 F.2d 292, 295 (7th Cir. 1992) ("It would create perverse incentives indeed if a qualified

immunity defense could succeed against those types of claims that have not previously arisen

because the behavior alleged is so egregious that no like case is on the books."); *see also Siebert*

*v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2001) (identifying two routes for proving that a right

is clearly established: (1) the violation is so obvious that a reasonable officer would know that

what he was doing violates the Constitution, or (2) a closely analogous case establishes that the

20

conduct is unconstitutional). The ultimate inquiry is whether the state of the law in October 2004 gave the Defendants fair warning that their treatment of the Plaintiff was unconstitutional. *Hope*, 536 U.S. at 741.

The Plaintiff argues that the Defendants had fair warning that their conduct was proscribed. He cites to the proposition from *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996), that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without provocation whatsoever." He contends that it is clearly established that force cannot be used against an arrestee who has not physically resisted arrest. The Plaintiff also argues that the Defendants' conduct so blatantly violates the Fourth Amendment that qualified immunity does not apply: "while there may be no specific case holding that a police officer who head-slams, body-slams, kicks, hits, grabs, pinches, and chips the tooth of a pre-trial detainee—simply because the detainee passively resisted an order to pick something off of the floor—does not mean that the officers are entitled to qualified immunity." (DE 39 at 6.)

The "no provocation whatsoever" clause of *Clash* does not fit the specific context of this case. There was provocation: the Plaintiff swore at Deputy Lewis and refused his command to pick up his hair tie. However, a reasonable officer would know that this level of provocation did not warrant a physical response from three to four officers in an attempt to force compliance with an order that was not given with the intent of promoting institutional safety or order. The only exception to this would be if the so-called provocation also threatened institutional security and force was required to maintain or restore institutional security. Viewing the facts most favorably to the Plaintiff, the Defendants should have know that their actions did not serve a legitimate government interest, but unnecessarily intruded on the Plaintiff's right to be free from

excessive force. In light of the Plaintiff's compliance throughout the arrest and booking process, the nature of Deputy Lewis's command, and the absence of any other inmates in the area, it would have been unreasonable to perceive the Plaintiff's actions as posing a threat to institutional safety that required the force of four officers. The Defendants use of force in this situation was plainly excessive such that they should have known they were violating the Plaintiff's rights. The Defendants' mistake regarding the amount of force that was justified under the circumstances was not a reasonable mistake.

Given the clearly established law, a reasonable officer would understand that pinching, hitting or kicking, and body slamming that caused bruising, swelling, and a chipping tooth would not be a reasonable response to an arrestee whose actions do not threaten officer safety or implicate institutional security.

## C.     Officer Bennet

To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right, *see Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.1995), or that the defendants stood idly by when they could have prevented the deprivation of that constitutional right, *see Miller v. Smith*, 99-2780, 220 F.3d 491, 495 (7th Cir. 2000). Under this rule, a prison guard who has a realistic opportunity to step forward and prevent a fellow guard from violating a prisoner's rights through the use of excessive force but fails to do so can be found liable. *See, e.g., Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

A genuine issue of fact remains regarding Officer Bennett's role in the events of October

30, 2004. Whether Officer Bennet participated in the physical altercation, had sufficient time to intervene, or was capable of preventing the harm caused by the other Defendants is an issue for the trier of fact, and she is not entitled to summary judgment.

## CONCLUSION AND ORDER

For the foregoing reasons, the Defendants' Motion for Summary Judgment [DE 30] is DENIED. The Final Pretrial Conference is confirmed for May 14, 2007, at 1:30 PM.

SO ORDERED on March 29, 2007.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT